# COLEMAN *v.* THOMPSON, WARDEN

No. 89–7662.   Argued February 25, 1991—Decided June 24, 1991

724

*John H. Hall* argued the cause for petitioner.   With him on the briefs were *Daniel J. Goldstein* and *Richard G. Price.*

*Donald R. Curry,* Senior Assistant Attorney General of Virginia, argued the cause for respondent. With him on the brief were *Mary Sue Terry,* Attorney General, *H. Lane Kneedler,* Chief Deputy Attorney General, *Stephen D. Rosenthal,* Deputy Attorney General, and *Jerry P. Slonaker,* Senior Assistant Attorney General.*

JUSTICE O'CONNOR delivered the opinion of the Court.

This is a case about federalism. It concerns the respect that federal courts owe the States and the States' procedural rules when reviewing the claims of state prisoners in federal habeas corpus.

I

A Buchanan County, Virginia, jury convicted Roger Keith Coleman of rape and capital murder and fixed the sentence at

---

*Briefs of *amici curiae* urging affirmance were filed for the State of Kentucky et al. by *Frederic J. Cowan,* Attorney General of Kentucky, and *Ian G. Sonego,* Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Jimmy Evans* of Alabama, *Winston Bryant* of Arkansas, *Gale Norton* of Colorado, *Charles M. Oberly III* of Delaware, *Robert A. Butterworth* of Florida, *Warren Price III* of Hawaii, *Larry EchoHawk* of Idaho, *Roland W. Burris* of Illinois, *Linley E. Pearson* of Indiana, *J. Joseph Curran, Jr.,* of Maryland, *Hubert H. Humphrey III* of Minnesota, *William L. Webster* of Missouri, *Marc Racicot* of Montana, *Don Stenbert* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Robert J. Del Tufo* of New Jersey, *Lacy H. Thornburg* of North Carolina, *Ernest D. Preate, Jr.,* of Pennsylvania, *T. Travis Medlock* of South Carolina, *Paul Van Dam* of Utah, *Ken Eikenberry* of Washington, and *Mario Palumbo* of West Virginia; for the State of Texas et al. by *Dan Morales,* Attorney General of Texas, *Will Pryor,* First Assistant Attorney General, *Mary F. Keller,* Executive Assistant Attorney General, and *Michael P. Hodge, Robert S. Walt, Dana E. Parker,* and *Margaret Portman Griffey,* Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Charles E. Cole* of Alaska, *Daniel E. Lungren* of California, *Michael C. Moore* of Mississippi, *Robert H. Henry* of Oklahoma, *Mark Barnett* of South Dakota, and *Joseph B. Meyer* of Wyoming; and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger.*

death for the murder. The trial court imposed the death sentence, and the Virginia Supreme Court affirmed both the convictions and the sentence. *Coleman* v. *Commonwealth*, 226 Va. 31, 307 S. E. 2d 864 (1983). This Court denied certiorari. 465 U. S. 1109 (1984).

Coleman then filed a petition for a writ of habeas corpus in the Circuit Court for Buchanan County, raising numerous federal constitutional claims that he had not raised on direct appeal. After a 2-day evidentiary hearing, the Circuit Court ruled against Coleman on all claims. App. 3–19. The court entered its final judgment on September 4, 1986.

Coleman filed his notice of appeal with the Circuit Court on October 7, 1986, 33 days after the entry of final judgment. Coleman subsequently filed a petition for appeal in the Virginia Supreme Court. The Commonwealth of Virginia, as appellee, filed a motion to dismiss the appeal. The sole ground for dismissal urged in the motion was that Coleman's notice of appeal had been filed late. Virginia Supreme Court Rule 5:9(a) provides that no appeal shall be allowed unless a notice of appeal is filed with the trial court within 30 days of final judgment.

The Virginia Supreme Court did not act immediately on the Commonwealth's motion, and both parties filed several briefs on the subject of the motion to dismiss and on the merits of the claims in Coleman's petition. On May 19, 1987, the Virginia Supreme Court issued the following order, dismissing Coleman's appeal:

> "On December 4, 1986 came the appellant, by counsel, and filed a petition for appeal in the above-styled case.
> "Thereupon came the appellee, by the Attorney General of Virginia, and filed a motion to dismiss the petition for appeal; on December 19, 1986 the appellant filed a memorandum in opposition to the motion to dismiss; on December 19, 1986 the appellee filed a reply to the appellant's memorandum; on December 23, 1986 the appellee

filed a brief in opposition to the petition for appeal; on December 23, 1986 the appellant filed a surreply in opposition to the appellee's motion to dismiss; and on January 6, 1987 the appellant filed a reply brief.

"Upon consideration whereof, the motion to dismiss is granted and the petition for appeal is dismissed." App. 25–26.

This Court again denied certiorari. *Coleman* v. *Bass*, 484 U. S. 918 (1987).

Coleman next filed a petition for writ of habeas corpus in the United States District Court for the Western District of Virginia. In his petition, Coleman presented four federal constitutional claims he had raised on direct appeal in the Virginia Supreme Court and seven claims he had raised for the first time in state habeas. The District Court concluded that, by virtue of the dismissal of his appeal by the Virginia Supreme Court in state habeas, Coleman had procedurally defaulted the seven claims. App. 38–39. The District Court nonetheless went on to address the merits of all 11 of Coleman's claims. The court ruled against Coleman on all of the claims and denied the petition. *Id.*, at 40–52.

The United States Court of Appeals for the Fourth Circuit affirmed. 895 F. 2d 139 (1990). The court held that Coleman had defaulted all of the claims that he had presented for the first time in state habeas. Coleman argued that the Virginia Supreme Court had not "clearly and expressly" stated that its decision in state habeas was based on a procedural default, and therefore the federal courts could not treat it as such under the rule of *Harris* v. *Reed*, 489 U. S. 255 (1989). The Fourth Circuit disagreed. It concluded that the Virginia Supreme Court had met the "plain statement" requirement of *Harris* by granting a motion to dismiss that was based solely on procedural grounds. 895 F. 2d, at 143. The Fourth Circuit held that the Virginia Supreme Court's deci-

sion rested on independent and adequate state grounds and that Coleman had not shown cause to excuse the default. *Id.*, at 143–144. As a consequence, federal review of the claims Coleman presented only in the state habeas proceeding was barred. *Id.*, at 144. We granted certiorari, 498 U. S. 937 (1990), to resolve several issues concerning the relationship between state procedural defaults and federal habeas review, and now affirm.

## II

### A

This Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment. See, *e. g.*, *Fox Film Corp.* v. *Muller*, 296 U. S. 207, 210 (1935); *Klinger* v. *Missouri*, 13 Wall. 257, 263 (1872). This rule applies whether the state law ground is substantive or procedural. See, *e. g.*, *Fox Film*, *supra; Herndon* v. *Georgia*, 295 U. S. 441 (1935). In the context of direct review of a state court judgment, the independent and adequate state ground doctrine is jurisdictional. Because this Court has no power to review a state law determination that is sufficient to support the judgment, resolution of any independent federal ground for the decision could not affect the judgment and would therefore be advisory. See *Herb* v. *Pitcairn*, 324 U. S. 117, 125–126 (1945) ("We are not permitted to render an advisory opinion, and if the same judgment would be rendered by the state court after we corrected its views of federal laws, our review could amount to nothing more than an advisory opinion").

We have applied the independent and adequate state ground doctrine not only in our own review of state court judgments, but in deciding whether federal district courts should address the claims of state prisoners in habeas corpus actions. The doctrine applies to bar federal habeas when

a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests on independent and adequate state procedural grounds. See *Wainwright* v. *Sykes*, 433 U. S. 72, 81, 87 (1977); *Ulster County Court* v. *Allen*, 442 U. S. 140, 148 (1979). See generally *Harris, supra,* at 262.

The basis for application of the independent and adequate state ground doctrine in federal habeas is somewhat different than on direct review by this Court. When this Court reviews a state court decision on direct review pursuant to 28 U. S. C. § 1257, it is reviewing the *judgment;* if resolution of a federal question cannot affect the judgment, there is nothing for the Court to do. This is not the case in habeas. When a federal district court reviews a state prisoner's habeas corpus petition pursuant to 28 U. S. C. § 2254, it must decide whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." *Ibid.* The court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter.* See *Fay* v. *Noia*, 372 U. S. 391, 430 (1963).

Nonetheless, a state prisoner is in custody *pursuant* to a judgment. When a federal habeas court releases a prisoner held pursuant to a state court judgment that rests on an independent and adequate state ground, it renders ineffective the state rule just as completely as if this Court had reversed the state judgment on direct review. See *id.,* at 469 (Harlan, J., dissenting). In such a case, the habeas court ignores the State's legitimate reasons for holding the prisoner.

In the habeas context, the application of the independent and adequate state ground doctrine is grounded in concerns of comity and federalism. Without the rule, a federal district court would be able to do in habeas what this Court could not do on direct review; habeas would offer state prisoners whose custody was supported by independent and ade-

quate state grounds an end run around the limits of this Court's jurisdiction and a means to undermine the State's interest in enforcing its laws.

When the independent and adequate state ground supporting a habeas petitioner's custody is a state procedural default, an additional concern comes into play. This Court has long held that a state prisoner's federal habeas petition should be dismissed if the prisoner has not exhausted available state remedies as to any of his federal claims. See *Ex parte Royall*, 117 U. S. 241 (1886). See also *Rose* v. *Lundy*, 455 U. S. 509 (1982); *Castille* v. *Peoples*, 489 U. S. 346 (1989); 28 U. S. C. § 2254(b) (codifying the rule). This exhaustion requirement is also grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights. As we explained in *Rose, supra:*

> "The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. See *Braden* v. *30th Judicial Circuit Court of Kentucky*, 410 U. S. 484, 490–491 (1973). Under our federal system, the federal and state 'courts [are] equally bound to guard and protect rights secured by the Constitution.' *Ex parte Royall*, 117 U. S., at 251. Because 'it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation,' federal courts apply the doctrine of comity, which 'teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter.' *Darr* v. *Burford*, 339 U. S. 200, 204 (1950)." *Id.*, at 518.

These same concerns apply to federal claims that have been procedurally defaulted in state court. Just as in those

cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance. A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer "available" to him. See 28 U. S. C. § 2254(b); *Engle* v. *Isaac*, 456 U. S. 107, 125–126, n. 28 (1982). In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases.

## B

It is not always easy for a federal court to apply the independent and adequate state ground doctrine. State court opinions will, at times, discuss federal questions at length and mention a state law basis for decision only briefly. In such cases, it is often difficult to determine if the state law discussion is truly an independent basis for decision or merely a passing reference. In other cases, state opinions purporting to apply state constitutional law will derive principles by reference to federal constitutional decisions from this Court. Again, it is unclear from such opinions whether the state law decision is independent of federal law.

In *Michigan* v. *Long*, 463 U. S. 1032 (1983), we provided a partial solution to this problem in the form of a conclusive presumption. Prior to *Long*, when faced with ambiguous state court decisions, this Court had adopted. various inconsistent and unsatisfactory solutions including dismissal of the case, remand to the state court for clarification, or an independent investigation of state law. *Id.*, at 1038–1040. These solutions were burdensome both to this Court and to

the state courts. They were also largely unnecessary in those cases where it fairly appeared that the state court decision rested primarily on federal law. The most reasonable conclusion in such cases is that there is not an independent and adequate state ground for the decision. Therefore, in order to minimize the costs associated with resolving ambiguities in state court decisions while still fulfilling our obligation to determine if there was an independent and adequate state ground for the decision, we established a conclusive presumption of jurisdiction in these cases:

> "[W]hen, as in this case, a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so." *Id.*, at 1040–1041.

After *Long*, a state court that wishes to look to federal law for guidance or as an alternative holding while still relying on an independent and adequate state ground can avoid the presumption by stating "clearly and expressly that [its decision] is . . . based on bona fide separate, adequate, and independent grounds." *Id.*, at 1041.

In *Caldwell* v. *Mississippi*, 472 U. S. 320 (1985), we applied the *Long* presumption in the context of an alleged independent and adequate state procedural ground. Caldwell, a criminal defendant, challenged at trial part of the prosecutor's closing argument to the jury, but he did not raise the issue on appeal to the Mississippi Supreme Court. That court raised the issue *sua sponte,* discussing this federal question at length in its opinion and deciding it against Caldwell. The court also made reference to its general rule that issues not raised on appeal are deemed waived. The State argued to this Court that the procedural default constituted an independent and adequate state ground for the Mississippi

court's decision. We rejected this argument, noting that the state decision "'fairly appears to rest primarily on federal law,'" and there was no clear and express statement that the Mississippi Supreme Court was relying on procedural default as an independent ground. *Id.*, at 327, quoting *Long, supra,* at 1040.

*Long* and *Caldwell* were direct review cases. We first considered the problem of ambiguous state court decisions in the application of the independent and adequate state ground doctrine in a federal habeas case in *Harris* v. *Reed,* 489 U. S. 255 (1989). Harris, a state prisoner, filed a petition for state postconviction relief, alleging that his trial counsel had rendered ineffective assistance. The state trial court dismissed the petition, and the Appellate Court of Illinois affirmed. In its order, the Appellate Court referred to the Illinois rule that "'those [issues] which could have been presented [on direct appeal], but were not, are considered waived.'" *Id.*, at 258. The court concluded that Harris could have raised his ineffective assistance claims on direct review. Nonetheless, the court considered and rejected Harris' claims on the merits. Harris then petitioned for federal habeas.

The situation presented to this Court was nearly identical to that in *Long* and *Caldwell:* a state court decision that fairly appeared to rest primarily on federal law in a context in which a federal court has an obligation to determine if the state court decision rested on an independent and adequate state ground. "Faced with a common problem, we adopt[ed] a common solution." *Harris, supra,* at 263. *Harris* applied in federal habeas the presumption this Court adopted in *Long* for direct review cases. Because the Illinois Appellate Court did not "clearly and expressly" rely on waiver as a ground for rejecting Harris' ineffective assistance of counsel claims, the *Long* presumption applied and Harris was not barred from federal habeas. *Harris, supra,* at 266.

After *Harris,* federal courts on habeas corpus review of state prisoner claims, like this Court on direct review of state

court judgments, will presume that there is no independent and adequate state ground for a state court decision when the decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion." *Long, supra,* at 1040–1041. In habeas, if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition.*

### III

### A

Coleman contends that the presumption of *Long* and *Harris* applies in this case and precludes a bar to habeas because the Virginia Supreme Court's order dismissing Coleman's appeal did not "clearly and expressly" state that it was based on state procedural grounds. Coleman reads *Harris* too broadly. A predicate to the application of the *Harris* presumption is that the decision of the last state court to which the petitioner presented his federal claims must fairly appear to rest primarily on federal law or to be interwoven with federal law.

Coleman relies on other language in *Harris*. That opinion announces that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case

---

*This rule does not apply if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred. In such a case there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims. See *Harris* v. *Reed,* 489 U. S. 255, 269–270 (1989) (O'CONNOR, J., concurring); *Teague* v. *Lane,* 489 U. S. 288, 297–298 (1989).

clearly and expressly states that its judgment rests on a state procedural bar." *Harris, supra,* at 263 (internal quotation marks omitted). Coleman contends that this rule, by its terms, applies to all state court judgments, not just those that fairly appear to rest primarily on federal law.

Coleman has read the rule out of context. It is unmistakably clear that *Harris* applies the same presumption in habeas that *Long* and *Caldwell* adopted in direct review cases in this Court. See *Harris,* 489 U. S., at 263 ("Faced with a common problem we adopt a common solution"); see also *id.,* at 264 ("Under our decision today, a state court need do nothing more to preclude habeas review than it must do to preclude direct review"). Indeed, the quoted passage purports to state the rule "on either direct or habeas review." *Harris,* being a federal habeas case, could not change the rule for direct review; the reference to both direct and habeas review makes plain that *Harris* applies precisely the same rule as *Long. Harris* describes the *Long* presumption, and hence its own, as applying only in those cases in which "'it fairly appears that the state court rested its decision primarily on federal law.'" *Harris, supra,* at 261, quoting *Long,* 463 U. S., at 1040. That in one particular exposition of its rule *Harris* does not mention the predicate to application of the presumption does not change the holding of the opinion.

Coleman urges a broader rule: that the presumption applies in all cases in which a habeas petitioner presented his federal claims to the state court. This rule makes little sense. In direct review cases, "[i]t is . . . 'incumbent upon this Court . . . to ascertain for itself . . . whether the asserted non-federal ground independently and adequately supports the [state court] judgment.'" *Long, supra,* at 1038, quoting *Abie State Bank* v. *Bryan,* 282 U. S. 765, 773 (1931). Similarly, federal habeas courts must ascertain for themselves if the petitioner is in custody pursuant to a state court judgment that rests on independent and adequate state grounds. In cases in which the *Long* and *Harris* presump-

tion applies, federal courts will conclude that the relevant state court judgment does not rest on an independent and adequate state ground.   The presumption, like all conclusive presumptions, is designed to avoid the costs of excessive inquiry where a *per se* rule will achieve the correct result in almost all cases.   As we explained in a different context:

> "*Per se* rules . . . require the Court to make broad generalizations . . . .   Cases that do not fit the generalization may arise, but a *per se* rule reflects the judgment that such cases are not sufficiently common or important to justify the time and expense necessary to identify them."   *Continental T. V., Inc.* v. *GTE Sylvania Inc.,* 433 U. S. 36, 50, n. 16 (1977).

*Per se* rules should not be applied, however, in situations where the generalization is incorrect as an empirical matter; the justification for a conclusive presumption disappears when application of the presumption will not reach the correct result most of the time.   The *Long* and *Harris* presumption works because in the majority of cases in which a state court decision fairly appears to rest primarily on federal law or to be interwoven with such law, and the state court does not plainly state that it is relying on an independent and adequate state ground, the state court decision did not in fact rest on an independent and adequate state ground.   We accept errors in those small number of cases where there was nonetheless an independent and adequate state ground in exchange for a significant reduction in the costs of inquiry.

The tradeoff is very different when the factual predicate does not exist.   In those cases in which it does not fairly appear that the state court rested its decision primarily on federal grounds, it is simply not true that the "most reasonable explanation" is that the state judgment rested on federal grounds.   Cf. *Long, supra,* at 1041.   Yet Coleman would have the federal courts apply a conclusive presumption of no independent and adequate state grounds in every case in which a state prisoner presented his federal claims to a state

court, regardless of whether it fairly appears that the state court addressed those claims. We cannot accept such a rule, for it would greatly and unacceptably expand the risk that federal courts will review the federal claims of prisoners in custody pursuant to judgments resting on independent and adequate state grounds. Any efficiency gained by applying a conclusive presumption, and thereby avoiding inquiry into state law, is simply not worth the cost in the loss of respect for the State that such a rule would entail.

It may be argued that a broadly applicable presumption is not counterfactual after it is announced: Once state courts know that their decisions resting on independent and adequate state procedural grounds will be honored in federal habeas only if there is a clear and express statement of the default, these courts will provide such a statement in all relevant cases. This argument does not help Coleman. Even assuming that *Harris* can be read as establishing a presumption in all cases, the Virginia Supreme Court issued its order dismissing Coleman's appeal *before* this Court decided *Harris*. As to this state court order, the absence of an express statement of procedural default is not very informative.

In any event, we decline to establish such a rule here, for it would place burdens on the States and state courts in exchange for very little benefit to the federal courts. We are, as an initial matter, far from confident that the empirical assumption of the argument for such a rule is correct. It is not necessarily the case that state courts will take pains to provide a clear and express statement of procedural default in all cases, even after announcement of the rule. State courts presumably have a dignitary interest in seeing that their state law decisions are not ignored by a federal habeas court, but most of the price paid for federal review of state prisoner claims is paid by the State. When a federal habeas court considers the federal claims of a prisoner in state custody for independent and adequate state law reasons, it is the State that must respond. It is the State that pays the price in

terms of the uncertainty and delay added to the enforcement of its criminal laws. It is the State that must retry the petitioner if the federal courts reverse his conviction. If a state court, in the course of disposing of cases on its overcrowded docket, neglects to provide a clear and express statement of procedural default, or is insufficiently motivated to do so, there is little the State can do about it. Yet it is primarily respect for the State's interests that underlies the application of the independent and adequate state ground doctrine in federal habeas.

A broad presumption would also put too great a burden on the state courts. It remains the duty of the federal courts, whether this Court on direct review, or lower federal courts in habeas, to determine the scope of the relevant state court judgment. We can establish a *per se* rule that eases the burden of inquiry on the federal courts in those cases where there are few costs to doing so, but we have no power to tell state courts how they must write their opinions. We encourage state courts to express plainly, in every decision potentially subject to federal review, the grounds upon which their judgments rest, but we will not impose on state courts the responsibility for using particular language in every case in which a state prisoner presents a federal claim—every state appeal, every denial of state collateral review—in order that federal courts might not be bothered with reviewing state law and the record in the case.

Nor do we believe that the federal courts will save much work by applying the *Harris* presumption in all cases. The presumption at present applies only when it fairly appears that a state court judgment rested primarily on federal law or was interwoven with federal law, that is, in those cases where a federal court has good reason to question whether there is an independent and adequate state ground for the decision. In the rest of the cases, there is little need for a conclusive presumption. In the absence of a clear indication

that a state court rested its decision on federal law, a federal court's task will not be difficult.

There is, in sum, little that the federal courts will gain by applying a presumption of federal review in those cases where the relevant state court decision does not fairly appear to rest primarily on federal law or to be interwoven with such law, and much that the States and state courts will lose. We decline to so expand the *Harris* presumption.

## B

The *Harris* presumption does not apply here. Coleman does not argue, nor could he, that it "fairly appears" that the Virginia Supreme Court's decision rested primarily on federal law or was interwoven with such law. The Virginia Supreme Court stated plainly that it was granting the Commonwealth's motion to dismiss the petition for appeal. That motion was based solely on Coleman's failure to meet the Supreme Court's time requirements. There is no mention of federal law in the Virginia Supreme Court's three-sentence dismissal order. It "fairly appears" to rest primarily on state law.

Coleman concedes that the Virginia Supreme Court dismissed his state habeas appeal as untimely, applying a state procedural rule. Brief for Petitioner 9. He argues instead that the court's application of this procedural rule was not independent of federal law.

Virginia Supreme Court Rule 5:5(a) declares that the 30-day requirement for filing a notice of appeal is "mandatory." The Virginia Supreme Court has reiterated the unwaivable nature of this requirement. See *School Bd. of Lynchburg* v. *Scott*, 237 Va. 550, 556, 379 S. E. 2d 319, 323 (1989); *Vaughn* v. *Vaughn*, 215 Va. 328, 329, 210 S. E. 2d 140, 142 (1974); *Mears* v. *Mears*, 206 Va. 444, 445, 143 S. E. 2d 889, 890 (1965). Despite these forthright pronouncements, Coleman contends that in this case the Virginia Supreme Court did not automatically apply its time requirement. Rather, Coleman

asserts, the court first considered the merits of his federal claims and applied the procedural bar only after determining that doing so would not abridge one of Coleman's constitutional rights. In *Ake* v. *Oklahoma*, 470 U. S. 68 (1985), this Court held that a similar Oklahoma rule, excusing procedural default in cases of "fundamental trial error," was not independent of federal law so as to bar direct review because "the State ha[d] made application of the procedural bar depend on an antecedent ruling on federal law." *Id.*, at 75. For the same reason, Coleman argues, the Virginia Supreme Court's time requirement is not independent of federal law.

*Ake* was a direct review case. We have never applied its rule regarding independent state grounds in federal habeas. But even if *Ake* applies here, it does Coleman no good because the Virginia Supreme Court relied on an independent state procedural rule.

Coleman cites *Tharp* v. *Commonwealth*, 211 Va. 1, 175 S. E. 2d 277 (1970). In that case, the Virginia Supreme Court announced that it was ending its practice of allowing extensions of time for petitions of writs of error in criminal and state habeas cases:

> "Henceforth we will extend the time for filing a petition for a writ of error only if it is found that to deny the extension would abridge a constitutional right." *Id.*, at 3, 175 S. E. 2d, at 278.

Coleman contends that the Virginia Supreme Court's exception for constitutional claims demonstrates that the court will conduct at least a cursory review of a petitioner's constitutional claims on the merits before dismissing an appeal.

We are not convinced that *Tharp* stands for the rule that Coleman believes it does. Coleman reads that case as establishing a practice in the Virginia Supreme Court of examining the merits of all underlying constitutional claims before denying a petition for appeal or writ of error as time barred. A more natural reading is that the Virginia Supreme Court will only grant an extension of time if *the denial itself* would

abridge a constitutional right. That is, the Virginia Supreme Court will extend its time requirement only in those cases in which the petitioner has a constitutional right to have the appeal heard.

This was the case, for example, in *Cabaniss* v. *Cunningham*, 206 Va. 330, 143 S. E. 2d 911 (1965). Cabaniss had defaulted the direct appeal of his criminal conviction because the trial court had failed to honor his request for appointed counsel on appeal, a request the court was required to honor under the Constitution. See *Douglas* v. *California*, 372 U. S. 353.(1963). The Virginia Supreme Court, on state collateral review, ordered that Cabaniss be given counsel and allowed to file a new appeal, although grossly out of time. 206 Va., at 335, 143 S. E. 2d, at 914. Enforcing the time requirements for appeal in that case would have abridged Cabaniss' constitutional right to counsel on appeal. See also *Thacker* v. *Peyton*, 206 Va. 771, 146 S. E. 2d 176 (1966) (same); *Stokes* v. *Peyton*, 207 Va. 1, 147 S. E. 2d 773 (1966) (same). Such a rule would be of no help to Coleman. He does not contend that the failure of the Virginia Supreme Court to hear his untimely state habeas appeal violated one of his constitutional rights.

Even if we accept Coleman's reading of *Tharp*, however, it is clear that the Virginia Supreme Court did not apply the *Tharp* rule here. *Tharp* concerns the filing requirement for *petitions*. Here, it was not Coleman's petition for appeal that was late, but his *notice* of appeal. A petition for appeal to the Virginia Supreme Court is a document filed with that court in which the petitioner describes the alleged errors in the decision below. Va. Sup. Ct. Rule 5:17(c). It need only be filed within three months of the final judgment of a trial court. Rule 5:17(a)(1). By contrast, the notice of appeal is a document filed *with the trial court* that notifies that court and the Virginia Supreme Court, as well as the parties, that there will be an appeal; it is a purely ministerial document. Rule 5:9. The notice of the appeal must be filed within 30

days of the final judgment of the trial court. *Ibid.* Coleman has cited no authority indicating that the Virginia Supreme Court has recognized an exception to the time requirement for filing a notice of appeal.

Coleman cites also *O'Brien* v. *Socony Mobil Oil Co.*, 207 Va. 707, 152 S. E. 2d 278 (1967). In that case, O'Brien, a civil litigant making a constitutional property rights claim, filed her notice of appeal several years late. She relied on three recent Virginia Supreme Court cases for the proposition that the court would waive the time requirement for notice of appeal where constitutional rights were at stake. See *Cabaniss, supra; Thacker, supra; Stokes, supra.* As noted, those were state habeas cases in which the Virginia Supreme Court determined that the petitioner had been denied direct appeal because of a constitutional error in failure to appoint counsel.

In *O'Brien*, the Virginia Supreme Court expressly reserved the "question whether the precedent of the *Cabaniss, Thacker* and *Stokes* cases should be followed in cases involving denial of constitutional property rights." 207 Va., at 715, 152 S. E. 2d, at 284. The court then addressed O'Brien's constitutional claim on the merits and ruled against her. As a result, there was no need to decide if she should be allowed an exception to the "mandatory" time requirement, *id.*, at 709, 152 S. E. 2d, at 280, and her appeal was dismissed as untimely.

Coleman argues that *O'Brien* demonstrates that the Virginia Supreme Court will review the merits of constitutional claims before deciding whether to dismiss an appeal as untimely. The court in *O'Brien* did conduct such a review, but the court also explicitly declined to announce a rule that there is a constitutional exception to the time requirement for filing a notice of appeal. There is no evidence other than *O'Brien* that the Virginia Supreme Court has ever conducted such a review, and *O'Brien* explicitly declined to announce such a

practice. We decline Coleman's invitation to announce such a practice for that court.

Finally, Coleman argues that the Virginia Supreme Court's dismissal order in this case is at least ambiguous because it was issued "[u]pon consideration" of all the filed papers, including Coleman's petition for appeal and the Commonwealth's brief in opposition, both of which discussed the merits of Coleman's federal claims. There is no doubt that the Virginia Supreme Court's "consideration" of all filed papers adds some ambiguity, but we simply cannot read it as overriding the court's explicit grant of a dismissal motion based solely on procedural grounds. Those grounds are independent of federal law.

Coleman contends also that the procedural bar was not adequate to support the judgment. Coleman did not petition for certiorari on this question, and we therefore accept the Court of Appeals' conclusion that the bar was adequate. See 895 F. 2d, at 143.

## IV

In *Daniels* v. *Allen*, the companion case to *Brown* v. *Allen*, 344 U. S. 443 (1953), we confronted a situation nearly identical to that here. Petitioners were convicted in a North Carolina trial court and then were one day late in filing their appeal as of right in the North Carolina Supreme Court. That court rejected the appeals as procedurally barred. We held that federal habeas was also barred unless petitioners could prove that they were "detained without opportunity to appeal because of lack of counsel, incapacity, or some interference by officials." *Id.*, at 485–486.

*Fay* v. *Noia*, 372 U. S. 391 (1963), overruled this holding. Noia failed to appeal at all in state court his state conviction, and then sought federal habeas review of his claim that his confession had been coerced. This Court held that such a procedural default in state court does not bar federal habeas review unless the petitioner has deliberately bypassed state procedures by intentionally forgoing an opportunity for state

review. *Id.*, at 438–439. *Fay* thus created a presumption in favor of federal habeas review of claims procedurally defaulted in state court. The Court based this holding on its conclusion that a State's interest in orderly procedure is sufficiently vindicated by the prisoner's forfeiture of his state remedies. "Whatever residuum of state interest there may be under such circumstances is manifestly insufficient in the face of the federal policy . . . of affording an effective remedy for restraints contrary to the Constitution." *Id.*, at 433–434.

Our cases after *Fay* that have considered the effect of state procedural default on federal habeas review have taken a markedly different view of the important interests served by state procedural rules. *Francis* v. *Henderson*, 425 U. S. 536 (1976), involved a Louisiana prisoner challenging in federal habeas the composition of the grand jury that had indicted him. Louisiana law provided that any such challenge must be made in advance of trial or it would be deemed waived. Because Francis had not raised a timely objection, the Louisiana courts refused to hear his claim. In deciding whether this state procedural default would also bar review in federal habeas, we looked to our decision in *Davis* v. *United States*, 411 U. S. 233 (1973). Davis, a federal prisoner, had defaulted an identical federal claim pursuant to Federal Rule of Criminal Procedure 12(b)(2). We held that a federal court on collateral review could not hear the claim unless Davis could show "cause" for his failure to challenge the composition of the grand jury before trial and actual prejudice as a result of the alleged constitutional violations. *Id.*, at 242–245.

The *Francis* Court noted the important interests served by the pretrial objection requirement of Rule 12(b)(2) and the parallel state rule: the possible avoidance of an unnecessary trial or of a retrial, the difficulty of making factual determinations concerning grand juries long after the indictment has been handed down and the grand jury disbanded, and the potential disruption to numerous convictions of finding a defect

in a grand jury only after the jury has handed down indictments in many cases. *Francis, supra,* at 540–541. These concerns led us in *Davis* to enforce Rule 12(b)(2) in collateral review. We concluded in *Francis* that a proper respect for the States required that federal courts give to the state procedural rule the same effect they give to the federal rule:

> "If, as *Davis* held, the federal courts must give effect to these important and legitimate concerns in § 2255 proceedings, then surely considerations of comity and federalism require that they give no less effect to the same clear interests when asked to overturn state criminal convictions. These considerations require that recognition be given 'to the legitimate interests of both State and National Governments, and . . . [that] the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always [endeavor] to do so in ways that will not unduly interfere with the legitimate activities of the States.' *Younger* v. *Harris,* 401 U. S. 37, 44. 'Plainly the interest in finality is the same with regard to both federal and state prisoners. . . . There is no reason to . . . give greater preclusive effect to procedural defaults by federal defendants than to similar defaults by state defendants. To hold otherwise would reflect an anomalous and erroneous view of federal-state relations.' *Kaufman* v. *United States,* 394 U. S. 217, 228." *Francis,* 425 U. S., at 541–542.

We held that Francis' claim was barred in federal habeas unless he could establish cause and prejudice. *Id.,* at 542.

*Wainwright* v. *Sykes,* 433 U. S. 72 (1977), applied the cause and prejudice standard more broadly. Sykes did not object at trial to the introduction of certain inculpatory statements he had earlier made to the police. Under Florida law, this failure barred state courts from hearing the claim on either direct appeal or state collateral review. We recognized that this contemporaneous objection rule served strong state interests in the finality of its criminal litigation. *Id.,* at

88–90. To protect these interests, we adopted the same presumption against federal habeas review of claims defaulted in state court for failure to object at trial that *Francis* had adopted in the grand jury context: the cause and prejudice standard. "We believe the adoption of the *Francis* rule in this situation will have the salutary effect of making the state trial on the merits the 'main event,' so to speak, rather than a 'tryout on the road' for what will later be the determinative federal habeas hearing." *Id.*, at 90.

In so holding, *Sykes* limited *Fay* to its facts. The cause and prejudice standard in federal habeas evinces far greater respect for state procedural rules than does the deliberate bypass standard of *Fay*. These incompatible rules are based on very different conceptions of comity and of the importance of finality in state criminal litigation. See Hill, The Forfeiture of Constitutional Rights in Criminal Cases, 78 Colum. L. Rev. 1050, 1053–1059 (1978). In *Sykes*, we left open the question whether the deliberate bypass standard still applied to a situation like that in *Fay*, where a petitioner has surrendered entirely his right to appeal his state conviction. *Sykes*, 433 U. S., at 88, n. 12. We rejected explicitly, however, "the sweeping language of *Fay* v. *Noia*, going far beyond the facts of the case eliciting it." *Id.*, at 87–88.

Our cases since *Sykes* have been unanimous in applying the cause and prejudice standard. *Engle* v. *Isaac*, 456 U. S. 107 (1982), held that the standard applies even in cases in which the alleged constitutional error impaired the truthfinding function of the trial. Respondents had failed to object at trial to jury instructions that placed on them the burden of proving self-defense. Ohio's contemporaneous objection rule barred respondents' claim on appeal that the burden should have been on the State. We held that this independent and adequate state ground barred federal habeas as well, absent a showing of cause and prejudice.

Recognizing that the writ of habeas corpus "is a bulwark against convictions that violate fundamental fairness," we

also acknowledged that "the Great Writ entails significant costs." *Id.*, at 126 (internal quotation marks omitted). The most significant of these is the cost to finality in criminal litigation that federal collateral review of state convictions entails:

> "As Justice Harlan once observed, '[b]oth the individual criminal defendant and society have an interest in insuring that there will at some point be the certainty that comes with an end to litigation, and that attention will ultimately be focused not on whether a conviction was free from error but rather on whether the prisoner can be restored to a useful place in the community.' *Sanders* v. *United States*, 373 U. S. 1, 24–25 (1963) (dissenting opinion)." *Id.*, at 127.

Moreover, "[f]ederal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Id.*, at 128. These costs are particularly high, we explained, when a state prisoner, through a procedural default, prevents adjudication of his constitutional claims in state court. Because these costs do not depend on the type of claim the prisoner raised, we reaffirmed that a state procedural default of any federal claim will bar federal habeas unless the petitioner demonstrates cause and actual prejudice. *Id.*, at 129. We also explained in *Engle* that the cause and prejudice standard will be met in those cases where review of a state prisoner's claim is necessary to correct "a fundamental miscarriage of justice." *Id.*, at 135. See also *Murray* v. *Carrier*, 477 U. S. 478, 496 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default").

In *Carrier*, we applied the cause and prejudice standard to a petitioner's failure to raise a particular claim in his state

court appeal. Again, we emphasized the important interests served by state procedural rules at every stage of the judicial process and the harm to the States that results when federal courts ignore these rules:

> "A State's procedural rules serve vital purposes at trial, on appeal, and on state collateral attack. . . .
> ". . . 'Each State's complement of procedural rules . . . channel[s], to the extent possible, the resolution of various types of questions to the stage of the judicial process at which they can be resolved most fairly and efficiently.' [*Reed* v. *Ross*, 468 U. S. 1, 10 (1984).] . . . Failure to raise a claim on appeal reduces the finality of appellate proceedings, deprives the appellate court of an opportunity to review trial error, and 'undercut[s] the State's ability to enforce its procedural rules.' *Engle*, 456 U. S., at 129." *Id.*, at 490–491.

In *Carrier*, as in *Sykes*, we left open the question whether *Fay*'s deliberate bypass standard continued to apply under the facts of that case, where a state prisoner has defaulted his entire appeal. See *Carrier, supra,* at 492; *Sykes, supra,* at 88, n. 12. We are now required to answer this question. By filing late, Coleman defaulted his entire state collateral appeal. This was no doubt an inadvertent error, and respondent concedes that Coleman did not "understandingly and knowingly" forgo the privilege of state collateral appeal. See *Fay*, 372 U. S., at 439. Therefore, if the *Fay* deliberate bypass standard still applies, Coleman's state procedural default will not bar federal habeas.

In *Harris*, we described in broad terms the application of the cause and prejudice standard, hinting strongly that *Fay* had been superseded:

> "Under *Sykes* and its progeny, an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show 'cause' for the default and 'prejudice

attributable thereto,' *Murray* v. *Carrier*, 477 U. S. 478, 485 (1986), or demonstrate that failure to consider the federal claim will result in a ' " "fundamental miscarriage of justice.' " ' *Id.*, at 495, quoting *Engle* v. *Isaac*, 456 U. S. 107, 135 (1982). See also *Smith* v. *Murray*, 477 U. S. 527, 537 (1986)." *Harris*, 489 U. S., at 262.

We now make it explicit: In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Fay* was based on a conception of federal/state relations that undervalued the importance of state procedural rules. The several cases after *Fay* that applied the cause and prejudice standard to a variety of state procedural defaults represent a different view. We now recognize the important interest in finality served by state procedural rules, and the significant harm to the States that results from the failure of federal courts to respect them. Cf. *McCleskey* v. *Zant*, 499 U. S. 467, 491 (1991) ("Though *Fay* v. *Noia*, *supra*, may have cast doubt upon these propositions, since *Fay* we have taken care in our habeas corpus decisions to reconfirm the importance of finality").

*Carrier* applied the cause and prejudice standard to the failure to raise a particular claim on appeal. There is no reason that the same standard should not apply to a failure to appeal at all. All of the State's interests—in channeling the resolution of claims to the most appropriate forum, in finality, and in having an opportunity to correct its own errors— are implicated whether a prisoner defaults one claim or all of them. A federal court generally should not interfere in either case. By applying the cause and prejudice standard uniformly to all independent and adequate state procedural

defaults, we eliminate the irrational distinction between *Fay* and the rule of cases like *Francis, Sykes, Engle,* and *Carrier.*

We also eliminate inconsistency between the respect federal courts show for state procedural rules and the respect they show for their own. This Court has long understood the vital interest served by *federal* procedural rules, even when they serve to bar federal review of constitutional claims. In *Yakus* v. *United States,* 321 U. S. 414 (1944), for example, the Court explained:

> "No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." *Id.,* at 444.

In *Browder* v. *Director, Illinois Dept. of Corrections,* 434 U. S. 257 (1978), we held that the appeal in a state prisoner federal habeas case was barred because untimely under Federal Rule of Appellate Procedure 4(a). In describing the "mandatory and jurisdictional" nature of the Rule and its justification, we might as well have been describing Virginia Supreme Court Rule 5:5(a):

> "This 30-day time limit is 'mandatory and jurisdictional.' The purpose of the rule is clear: It is 'to set a definite point of time when litigation should be at an end, unless within that time the prescribed application has been made; and if it has not been, to advise prospective appellees that they are freed of the appellant's demands. Any other construction of the statute would defeat its purpose.' *Matton Steamboat* [*Co.* v. *Murphy,* 319 U. S. 412, 415 (1943)]." *Browder, supra,* at 264 (citations omitted).

No less respect should be given to state rules of procedure. See *Francis,* 425 U. S., at 541–542.

V

A

Coleman maintains that there was cause for his default. The late filing was, he contends, the result of attorney error of sufficient magnitude to excuse the default in federal habeas.

*Murray* v. *Carrier* considered the circumstances under which attorney error constitutes cause. Carrier argued that his attorney's inadvertence in failing to raise certain claims in his state appeal constituted cause for the default sufficient to allow federal habeas review. We rejected this claim, explaining that the costs associated with an ignorant or inadvertent procedural default are no less than where the failure to raise a claim is a deliberate strategy: It deprives the state courts of the opportunity to review trial errors. When a federal habeas court hears such a claim, it undercuts the State's ability to enforce its procedural rules just as surely as when the default was deliberate. 477 U. S., at 487. We concluded: "So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland* v. *Washington*, [466 U. S. 668 (1984)], we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default." *Id.*, at 488.

Applying the *Carrier* rule as stated, this case is at an end. There is no constitutional right to an attorney in state postconviction proceedings. *Pennsylvania* v. *Finley*, 481 U. S. 551 (1987); *Murray* v. *Giarratano*, 492 U. S. 1 (1989) (applying the rule to capital cases). Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings. See *Wainwright* v. *Torna*, 455 U. S. 586 (1982) (where there is no constitutional right to counsel there can be no deprivation of effective assistance). Coleman contends that it was his attorney's error that led to the late filing of his state habeas appeal. This error cannot be constitutionally ineffective; therefore Coleman must "bear

the risk of attorney error that results in a procedural default."

Coleman attempts to avoid this reasoning by arguing that *Carrier* does not stand for such a broad proposition. He contends that *Carrier* applies by its terms only in those situations where it is possible to state a claim for ineffective assistance of counsel. Where there is no constitutional right to counsel, Coleman argues, it is enough that a petitioner demonstrate that his attorney's conduct would meet the *Strickland* standard, even though no independent Sixth Amendment claim is possible.

This argument is inconsistent not only with the language of *Carrier*, but with the logic of that opinion as well. We explained clearly that "cause" under the cause and prejudice test must be something *external* to the petitioner, something that cannot fairly be attributed to him: "[W]e think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." 477 U. S., at 488. For example, "a showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . or that 'some interference by officials' . . . made compliance impracticable, would constitute cause under this standard." *Ibid.* See also *id.*, at 492 ("[C]ause for a procedural default on appeal ordinarily requires a showing of some external impediment preventing counsel from constructing or raising the claim").

Attorney ignorance or inadvertence is not "cause" because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must "bear the risk of attorney error." *Id.*, at 488. See *Link* v. *Wabash R. Co.*, 370 U. S. 626, 634 (1962) (in "our system of representative litigation . . . each party is deemed bound by the acts of his lawyer-agent"); *Irwin* v. *Department of Veterans Affairs*, 498 U. S. 89, 92 (1990) (same). Attor-

ney error that constitutes ineffective assistance of counsel is cause, however. This is not because, as Coleman contends, the error is so bad that "the lawyer ceases to be an agent of the petitioner." Brief for Petitioner 29. In a case such as this, where the alleged attorney error is inadvertence in failing to file a timely notice, such a rule would be contrary to well-settled principles of agency law. See, e. g., Restatement (Second) of Agency § 242 (1958) (master is subject to liability for harm caused by negligent conduct of servant within the scope of employment). Rather, as *Carrier* explains, "if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State." 477 U. S., at 488. In other words, it is not the gravity of the attorney's error that matters, but that it constitutes a violation of petitioner's right to counsel, so that the error must be seen as an external factor, i. e., "imputed to the State." See also *Evitts* v. *Lucey*, 469 U. S. 387, 396 (1985) ("The constitutional mandate [guaranteeing effective assistance of counsel] is addressed to the action of the State in obtaining a criminal conviction through a procedure that fails to meet the standard of due process of law").

Where a petitioner defaults a claim as a result of the denial of the right to effective assistance of counsel, the State, which is responsible for the denial as a constitutional matter, must bear the cost of any resulting default and the harm to state interests that federal habeas review entails. A different allocation of costs is appropriate in those circumstances where the State has no responsibility to ensure that the petitioner was represented by competent counsel. As between the State and the petitioner, it is the petitioner who must bear the burden of a failure to follow state procedural rules. In the absence of a constitutional violation, the petitioner bears the risk in federal habeas for all attorney errors made in the course of the representation, as *Carrier* says explicitly.

## B

Among the claims Coleman brought in state habeas, and then again in federal habeas, is ineffective assistance of counsel during trial, sentencing, and appeal. Coleman contends that, at least as to these claims, attorney error in state habeas must constitute cause. This is because, under Virginia law at the time of Coleman's trial and direct appeal, ineffective assistance of counsel claims related to counsel's conduct during trial or appeal could be brought only in state habeas. See *Walker* v. *Mitchell*, 224 Va. 568, 571, 299 S. E. 2d 698, 699–700 (1983); *Dowell* v. *Commonwealth*, 3 Va. App. 555, 562, 351 S. E. 2d 915, 919 (1987). Coleman argues that attorney error in failing to file timely in the first forum in which a federal claim can be raised is cause.

We reiterate that counsel's ineffectiveness will constitute cause only if it is an independent constitutional violation. *Finley* and *Giarratano* established that there is no right to counsel in state collateral proceedings. For Coleman to prevail, therefore, there must be an exception to the rule of *Finley* and *Giarratano* in those cases where state collateral review is the first place a prisoner can present a challenge to his conviction. We need not answer this question broadly, however, for one state court has addressed Coleman's claims: the state habeas trial court. The effectiveness of Coleman's counsel before that court is not at issue here. Coleman contends that it was the ineffectiveness of his counsel during the appeal from that determination that constitutes cause to excuse his default. We thus need to decide only whether Coleman had a constitutional right to counsel on appeal from the state habeas trial court judgment. We conclude that he did not.

*Douglas* v. *California*, 372 U. S. 353 (1963), established that an indigent criminal defendant has a right to appointed counsel in his first appeal as of right in state court. *Evitts* v. *Lucey, supra,* held that this right encompasses a right to effective assistance of counsel for all criminal defendants in

their first appeal as of right. We based our holding in *Douglas* on that "equality demanded by the Fourteenth Amendment." 372 U. S., at 358. Recognizing that "[a]bsolute equality is not required," we nonetheless held that "where the merits of *the one and only appeal* an indigent has as of right are decided without benefit of counsel, we think an unconstitutional line has been drawn between rich and poor." *Id.*, at 357 (emphasis in original).

Coleman has had his "one and only appeal," if that is what a state collateral proceeding may be considered; the Buchanan County Circuit Court, after a 2-day evidentiary hearing, addressed Coleman's claims of trial error, including his ineffective assistance of counsel claims. What Coleman requires here is a right to counsel on appeal from *that* determination. Our case law will not support it.

In *Ross* v. *Moffitt*, 417 U. S. 600 (1974), and *Pennsylvania* v. *Finley*, 481 U. S. 551 (1987), we declined to extend the right to counsel beyond the first appeal of a criminal conviction. We held in *Ross* that neither the fundamental fairness required by the Due Process Clause nor the Fourteenth Amendment's equal protection guarantee necessitated that States provide counsel in state discretionary appeals where defendants already had one appeal as of right. "The duty of the State under our cases is not to duplicate the legal arsenal that may be privately retained by a criminal defendant in a continuing effort to reverse his conviction, but only to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the State's appellate process." 417 U. S., at 616. Similarly, in *Finley* we held that there is no right to counsel in state collateral proceedings after exhaustion of direct appellate review. 481 U. S., at 556 (citing *Ross, supra*).

These cases dictate the answer here. Given that a criminal defendant has no right to counsel beyond his first appeal in pursuing state discretionary or collateral review, it would defy logic for us to hold that Coleman had a right to counsel

to appeal a state collateral determination of his claims of trial error.

Because Coleman had no right to counsel to pursue his appeal in state habeas, any attorney error that led to the default of Coleman's claims in state court cannot constitute cause to excuse the default in federal habeas. As Coleman does not argue in this Court that federal review of his claims is necessary to prevent a fundamental miscarriage of justice, he is barred from bringing these claims in federal habeas. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE WHITE, concurring.

I concur in the judgment of the Court and I join in its opinion, but add a few words concerning what occurred below. *Harris* v. *Reed*, 489 U. S. 255 (1989), stated that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case '"clearly and expressly"' states that its judgment rests on a state procedural bar." *Id.*, at 263, quoting *Caldwell* v. *Mississippi*, 472 U. S. 320, 327 (1985), in turn quoting *Michigan* v. *Long*, 463 U. S. 1032, 1041 (1983). If there were nothing before us but the order granting the State's motion to dismiss for untimeliness, it would be clear enough that the dismissal was based on a procedural default.

But the state court did not grant the State's explicit request for an early ruling on the motion. Instead, the court delayed ruling on the motion to dismiss, and hence briefs on both the motion and the merits were filed. Six months later, the court "upon consideration whereof" granted the State's motion to dismiss the appeal. Hence petitioner's argument that the court studied the merits of the federal claims to determine whether to waive the procedural default, found those claims lacking, and only then granted the motion to dismiss; it is as though the court had said that it was granting the motion to dismiss the appeal as untimely because the federal

claims were untenable and provided the court no reason to waive the default.

The predicate for this argument is that on occasion the Virginia Supreme Court waives the untimeliness rule. If that were true, the rule would not be an adequate and independent state ground barring direct or habeas review. Cf. *Ake v. Oklahoma*, 470 U. S. 68, 75 (1985). The filing of briefs and their consideration would do no more than buttress the claim that the rule is not strictly enforced.

Petitioner argues that the Virginia court does in fact waive the rule on occasion, but I am not now convinced that there is a practice of waiving the rule when constitutional issues are at stake, even fundamental ones. The evidence is too scanty to permit a conclusion that the rule is no longer an adequate and independent state ground barring federal review. The fact that merits briefs were filed and were considered by the court, without more, does not justify a different conclusion.

JUSTICE BLACKMUN, with whom JUSTICE MARSHALL and JUSTICE STEVENS join, dissenting.

Federalism; comity; state sovereignty; preservation of state resources; certainty: The majority methodically inventories these multifarious state interests before concluding that the plain-statement rule of *Michigan* v. *Long*, 463 U. S. 1032 (1983), does not apply to a summary order. One searches the majority's opinion in vain, however, for any mention of petitioner Coleman's right to a criminal proceeding free from constitutional defect or his interest in finding a forum for his constitutional challenge to his conviction and sentence of death. Nor does the majority even allude to the "important need for uniformity in federal law," *id.*, at 1040, which justified this Court's adoption of the plain-statement rule in the first place. Rather, displaying obvious exasperation with the breadth of substantive federal habeas doctrine and the expansive protection afforded by the Fourteenth Amendment's guarantee of fundamental fairness in state criminal proceedings, the Court today continues its crusade

to erect petty procedural barriers in the path of any state prisoner seeking review of his federal constitutional claims. Because I believe that the Court is creating a Byzantine morass of arbitrary, unnecessary, and unjustifiable impediments to the vindication of federal rights, I dissent.

## I

The Court cavalierly claims that "[t]his is a case about federalism," *ante*, at 726, and proceeds without explanation to assume that the purposes of federalism are advanced whenever a federal court refrains from reviewing an ambiguous state-court judgment. Federalism, however, has no inherent normative value: It does not, as the majority appears to assume, blindly protect the interests of States from any incursion by the federal courts. Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power. "Federalism is a device for realizing the concepts of decency and fairness which are among the fundamental principles of liberty and justice lying at the base of all our civil and political institutions." Brennan, Federal Habeas Corpus and State Prisoners: An Exercise in Federalism, 7 Utah L. Rev. 423, 442 (1961). See also The Federalist No. 51, p. 324 (C. Rossiter ed. 1961) (J. Madison) ("Justice is the end of government. It is the end of civil society"). In this context, it cannot lightly be assumed that the interests of federalism are fostered by a rule that impedes federal review of federal constitutional claims.

Moreover, the form of federalism embraced by today's majority bears little resemblance to that adopted by the Framers of the Constitution and ratified by the original States. The majority proceeds as if the sovereign interests of the States and the Federal Government were coequal. Ours, however, is a federal republic, conceived on the principle of a supreme federal power and constituted first and foremost of citizens, not of sovereign States. The citizens expressly declared: "This Constitution, and the Laws of the United States

which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U. S. Const., Art. VI, cl. 2. James Madison felt that a constitution without this Clause "would have been evidently and radically defective." The Federalist No. 44, p. 286 (C. Rossiter ed. 1961). The ratification of the Fourteenth Amendment by the citizens of the several States expanded federal powers even further, with a corresponding diminution of state sovereignty. See *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 453–456 (1976); *Ex parte Virginia*, 100 U. S. 339, 344–348 (1880). Thus, "the sovereignty of the States is limited by the Constitution itself." *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 548 (1985).

Federal habeas review of state-court judgments, respectfully employed to safeguard federal rights, is no invasion of state sovereignty. Cf. *Ex parte Virginia*, 100 U. S., at 346. Since 1867, Congress has acted within its constitutional authority to "'interpose the federal courts between the States and the people, as guardians of the people's federal rights — to protect the people from unconstitutional action.'" *Reed* v. *Ross*, 468 U. S. 1, 10 (1984), quoting *Mitchum* v. *Foster*, 407 U. S. 225, 242 (1972). See 28 U. S. C. § 2254. Justice Frankfurter, in his separate opinion in *Brown* v. *Allen*, 344 U. S. 443, 510 (1953), recognized this:

> "Insofar as [federal habeas] jurisdiction enables federal district courts to entertain claims that State Supreme Courts have denied rights guaranteed by the United States Constitution, it is not a case of a lower court sitting in judgment on a higher court. It is merely one aspect of respecting the Supremacy Clause of the Constitution whereby federal law is higher than State law."

Thus, the considered exercise by federal courts — in vindication of fundamental constitutional rights — of the habeas jurisdiction conferred on them by Congress exemplifies the full expression of this Nation's federalism.

That the majority has lost sight of the animating principles of federalism is well illustrated by its discussion of the duty of a federal court to determine whether a state-court judgment rests on an adequate and independent state ground. According to the majority's formulation, establishing this duty in the federal court serves to diminish the risk that a federal habeas court will review the federal claims of a prisoner in custody pursuant to a judgment that rests upon an adequate and independent state ground. In reality, however, this duty of a federal court to determine its jurisdiction originally was articulated to ensure that federal rights were not improperly denied a federal forum. Thus, the quote artfully reconstituted by the majority, *ante*, at 736, originally read: "[I]t is incumbent upon this Court, when it is urged that the decision of the state court rests upon a non-federal ground, to ascertain for itself, *in order that constitutional guarantees may appropriately be enforced,* whether the asserted non-federal ground independently and adequately supports the judgment." *Abie State Bank* v. *Bryan,* 282 U. S. 765, 773 (1931) (emphasis added). Similarly, the Court has stated that the duty "cannot be disregarded without neglecting or renouncing a jurisdiction conferred by the law and designed to protect and maintain the supremacy of the Constitution and the laws made in pursuance thereof." *Ward* v. *Board of Comm'rs of Love County,* 253 U. S. 17, 23 (1920). Indeed, the duty arose out of a distinct distrust of state courts, which this Court perceived as attempting to evade federal review. See *Broad River Power Co.* v. *South Carolina ex rel. Daniel,* 281 U. S. 537, 540 (1930) ("Even though the constitutional protection invoked be denied on non-federal grounds, it is the province of this Court to inquire whether the decision of the state court rests upon a fair and substantial basis. If unsubstantial, constitutional obligations may not thus be evaded").

From these noble beginnings, the Court has managed to transform the duty to protect federal rights into a self-fashioned abdication. Defying the constitutional allocation

of sovereign authority, the Court now requires a federal court to scrutinize the state-court judgment with an eye to denying a litigant review of his federal claims rather than enforcing those provisions of the Federal Bill of Rights that secure individual autonomy.

## II

Even if one acquiesced in the majority's unjustifiable elevation of abstract federalism over fundamental precepts of liberty and fairness, the Court's conclusion that the plain-statement rule of *Michigan* v. *Long* does not apply to a summary order defies both settled understandings and compassionate reason.

## A

As an initial matter, it cannot seriously be disputed that the Court's opinion in *Harris* v. *Reed*, 489 U. S. 255 (1989), expressly considered this issue and resolved the question quite contrary to the Court's holding today. Both *Long* and *Harris* involved a federal review of a state-court opinion that, on its face, addressed the merits of the underlying claims and resolved those claims with express reference to both state and federal law. See *Long*, 463 U. S., at 1037, and n. 3; *Harris*, 489 U. S., at 257–258. In each case, it was not disputed that the alleged state ground had been invoked: The Court was faced with the question whether that state ground was adequate to support the judgment and independent of federal law. Accordingly, the *Long* and *Harris* Courts spoke of state-court judgments that "fairly appea[r] to rest primarily on federal law, or to be interwoven with federal law," *Long*, 463 U. S., at 1040, or that contained "ambiguous . . . references to state law." *Harris*, 489 U. S., at 263.

The majority asserts that these statements establish a factual predicate for the application of the plain-statement rule. *Ante*, at 735–736. Neither opinion, however, purported to limit the application of the plain-statement rule to the narrow

circumstances presented in the case under review. In fact, the several opinions in *Harris* make plain that for purposes of federal habeas, the Court was adopting the *Long* presumption for all cases where federal claims are presented to state courts.

The *Harris* Court expressed its understanding of *Long* unequivocally: "We held in *Long* that unless the state court clearly expressed its reliance on an adequate and independent state-law ground, this Court may address a federal issue considered by the state court." 489 U. S., at 262–263. Armed with that understanding, the Court concluded that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case '"clearly and expressly"' states that its judgment rests on a state procedural bar." *Id.*, at 263, quoting *Caldwell* v. *Mississippi*, 472 U. S. 320, 327 (1985), in turn quoting *Long*, 463 U. S., at 1041.

JUSTICE O'CONNOR, in a concurring opinion joined by THE CHIEF JUSTICE and JUSTICE SCALIA, echoed the majority's indication that the *Long* presumption applied to all cases where a federal claim is presented to the state courts. She wrote separately to emphasize that the Court's opinion did not alter the well-settled rule that federal courts may look to state procedural-default rules in determining whether a federal claim has been properly exhausted in the state courts. See 489 U. S., at 268–270. "[I]t is simply impossible," according to the concurrence, "to '[r]equir[e] a state court to be explicit in its reliance on a procedural default' . . . where a claim raised on federal habeas has never been presented to the state courts at all." *Id.*, at 270. Certainly, if the Court's opinion had been limited to cases where the state court's judgment fairly appeared to rest on federal law or was interwoven with federal law, the point painstakingly made in this concurrence would have been unnecessary.

That *Harris'* adoption of the plain-statement rule for federal habeas cases was intended to apply to all cases where

federal claims were presented to the state courts is confirmed by the exchange there between the majority and the dissent. In his dissenting opinion, JUSTICE KENNEDY maintained that the Court's formulation of the plain-statement rule would encourage habeas prisoners whose claims would otherwise be procedurally barred to file "a never-ending stream of petitions for postconviction relief" in hope of being "rewarded with a suitably ambiguous rebuff, *perhaps a one-line order finding that a prisoner's claim 'lacks merit' or stating that relief is 'denied.'*" *Id.*, at 282 (emphasis added). The Court responded that "the dissent's fear . . . that our holding will submerge courts in a flood of improper prisoner petitions is unrealistic: a state court that wishes to rely on a procedural bar rule in a one-line *pro forma* order easily can write that 'relief is denied for reasons of procedural default.'" *Id.*, at 265, n. 12. The *Harris* Court's holding that the plain-statement rule applies to a summary order could not itself have been more plain. Because the majority acknowledges that the Virginia Supreme Court's dismissal order "adds some ambiguity," *ante*, at 744, *Harris* compels a federal habeas court to provide a forum for the consideration of Coleman's federal claims.

## B

Notwithstanding the clarity of the Court's holding in *Harris*, the majority asserts that Coleman has read the rule announced therein "out of context." *Ante*, at 736. I submit, however, that it is the majority that has wrested *Harris* out of the context of a preference for the vindication of fundamental constitutional rights and that has set it down in a vacuum of rhetoric about federalism. In its attempt to justify a blind abdication of responsibility by the federal courts, the majority's opinion marks the nadir of the Court's recent habeas jurisprudence, where the discourse of rights is routinely replaced with the functional dialect of interests. The Court's habeas jurisprudence now routinely, and without evident reflection, subordinates fundamental constitutional rights to

mere utilitarian interests. See, *e. g.*, *McCleskey* v. *Zant*, 499 U. S. 467 (1991). Such unreflective cost-benefit analysis is inconsistent with the very idea of rights. See generally Cover & Aleinikoff, Dialectical Federalism: Habeas Corpus and the Court, 86 Yale L. J. 1035, 1092 (1977). The Bill of Rights is not, after all, a collection of technical interests, and "surely it is an abuse to deal too casually and too lightly with rights guaranteed" therein. *Brown* v. *Allen*, 344 U. S., at 498 (opinion of Frankfurter, J.).

It is well settled that the existence of a state procedural default does not divest a federal court of jurisdiction on collateral review. See *Wainwright* v. *Sykes*, 433 U. S. 72, 82–84 (1977). Rather, the important office of the federal courts in vindicating federal rights gives way to the States' enforcement of their procedural rules to protect the States' interest in being an equal partner in safeguarding federal rights. This accommodation furthers the values underlying federalism in two ways. First, encouraging a defendant to assert his federal rights in the appropriate state forum makes it possible for transgressions to be arrested sooner and before they influence an erroneous deprivation of liberty. Second, thorough examination of a prisoner's federal claims in state court permits more effective review of those claims in federal court, honing the accuracy of the writ as an implement to eradicate unlawful detention. See *Rose* v. *Lundy*, 455 U. S. 509, 519 (1982); *Brown* v. *Allen*, 344 U. S., at 500–501 (opinion of Frankfurter, J.). The majority ignores these purposes in concluding that a State need not bear the burden of making clear its intent to rely on such a rule. When it is uncertain whether a state-court judgment denying relief from federal claims rests on a procedural bar, it is inconsistent with federalism principles for a federal court to exercise discretion to decline to review those federal claims.

In justifying its new rule, the majority first announces that, as a practical matter, the application of the *Long* presumption to a summary order entered in a case where a state

prisoner presented federal constitutional claims to a state court is unwarranted, because "it is simply not true that the 'most reasonable explanation' is that the state judgment rested on federal grounds." *Ante*, at 737, quoting *Long*, 463 U. S., at 1041. The majority provides no support for this flat assertion. In fact, the assertion finds no support in reality. "Under our federal system, the federal and state 'courts [are] equally bound to guard and protect the rights secured by the Constitution.'" *Rose* v. *Lundy*, 455 U. S., at 518, quoting *Ex parte Royall*, 117 U. S. 241, 251 (1886). Accordingly, state prisoners are required to present their federal claims to state tribunals before proceeding to federal habeas, "to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings." 455 U. S., at 518. See 28 U. S. C. § 2254. Respect for the States' responsible assumption of this solemn trust compels the conclusion that state courts presented with federal constitutional claims actually resolve those claims unless they indicate to the contrary. Cf. *Brown* v. *Allen*, 344 U. S., at 512 (opinion of Frankfurter, J.) ("[The availability of the writ of habeas corpus] does not mean that prison doors may readily be opened. It does mean that explanation may be exacted why they should remain closed").

The majority claims that applying the plain-statement rule to summary orders "would place burdens on the States and state courts," *ante*, at 738, suggesting that these burdens are borne independently by the States and their courts. The State, according to the majority, "pays the price" for federal review of state prisoner claims "in terms of the uncertainty and delay" as well as in the cost of a retrial. *Id.*, at 738–739. The majority is less clear about the precise contours of the burden this rule is said to place on state courts, merely asserting that it "would also put too great a burden on the state courts." *Ante*, at 739.

The majority's attempt to distinguish between the interests of state courts and the interests of the States in this

context is inexplicable. States do not exist independent of their officers, agents, and citizens. Rather, "[t]hrough the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign." *Gregory* v. *Ashcroft, ante,* at 460. See also *Ex parte Virginia,* 100 U. S., at 347 ("A State acts by its legislative, its executive, or its judicial authorities. It can act in no other way"). The majority's novel conception of dichotomous interests is entirely unprecedented. See *ibid.* ("[H]e [who] acts in the name and for the State, and is clothed with the State's power, his act is that of the State"). More-over, it admits of no readily apparent limiting principle. For instance, should a federal habeas court decline to review claims that the state judge committed constitutional error at trial simply because the costs of a retrial will be borne by the State? After all, as the majority asserts, "there is little the State can do about" constitutional errors made by its trial judges. *Ante,* at 739.

Even if the majority correctly attributed the relevant state interests, they are, nonetheless, misconceived. The major-ity appears most concerned with the financial burden that a retrial places on the States. Of course, if the initial trial con-formed to the mandate of the Federal Constitution, not even the most probing federal review would necessitate a retrial. Thus, to the extent the State must "pay the price" of retry-ing a state prisoner, that price is incurred as a direct result of the State's failure scrupulously to honor his federal rights, not as a consequence of unwelcome federal review. See *Teague* v. *Lane,* 489 U. S. 288, 306 (1989) (opinion of O'CON-NOR, J., joined by REHNQUIST, C. J., and SCALIA and KEN-NEDY, JJ., quoting *Desist* v. *United States,* 394 U. S. 244, 262–263 (1969) (Harlan, J., dissenting)) ("'[T]he threat of ha-beas serves as a necessary additional incentive for trial and appellate courts throughout the land to conduct their pro-ceedings in a manner consistent with established constitu-tional standards'").

The majority also contends without elaboration that a "broad presumption [of federal jurisdiction] would . . . put too great a burden on the state courts." *Ante*, at 739. This assertion not only finds no support in *Long*, where the burden of the presumption on state courts is not even mentioned, but also is premised on the misconception that the plain-statement rule serves only to relieve the federal court of the "bother" of determining the basis of the relevant state-court judgment. Viewed responsibly, the plain-statement rule provides a simple mechanism by which a state court may invoke the discretionary deference of the federal habeas court and virtually insulate its judgment from federal review. While state courts may choose to draw their orders as they wish, the right of a state prisoner, particularly one sentenced to death, to have his federal claim heard by a federal habeas court is simply too fundamental to yield to the State's incidental interest in issuing ambiguous summary orders.

## C

Not only is the majority's abandonment of the plain-statement rule for purposes of summary orders unjustified, it is also misguided. In *Long*, the Court adopted the plain-statement rule because we had "announced a number of principles in order to help us determine" whether ambiguous state-court judgments rested on adequate and independent state grounds, but had "not developed a satisfying and consistent approach for resolving this vexing issue." 463 U. S., at 1038. Recognizing that "[t]his ad hoc method of dealing with cases that involve possible adequate and independent state grounds is antithetical to the doctrinal consistency that is *required* when sensitive issues of federal-state relations are involved," *id.*, at 1039 (emphasis added), the Court determined that a broad presumption of federal jurisdiction combined with a simple mechanism by which state courts could clarify their intent to rely on state grounds would best "provide state judges with a clearer opportunity to develop state

jurisprudence unimpeded by federal interference, and yet will preserve the integrity of federal law," *id.*, at 1041. Today's decision needlessly resurrects the piecemeal approach eschewed by *Long* and, as a consequence, invites the intrusive and unsatisfactory federal inquiry into unfamiliar state law that *Long* sought to avoid.

The Court's decisions in this case and in *Ylst* v. *Nunnemaker*, *post*, p. 797, well reveal the illogic of the ad hoc approach. In this case, to determine whether the admittedly ambiguous state-court judgment rests on an adequate and independent state ground, the Court looks to the "nature of the disposition" and the "surrounding circumstances" that "indicat[e]" that the basis [of the decision] was procedural default. *Ylst, post*, at 802. This method of searching for "clues" to the meaning of a facially ambiguous order is inherently indeterminate. Tellingly, both the majority and concurring opinions in this case concede that it remains uncertain whether the state court relied on a procedural default. See *ante*, at 744 ("There is no doubt that the Virginia Supreme Court's 'consideration' of all filed papers adds some ambiguity"); *ante*, at 757–758 (WHITE, J., concurring) ("[I]t is as though the court had said that it was granting the motion to dismiss the appeal as untimely because the federal claims were untenable and provided the court no reason to waive the default"). The plain-statement rule effectively and equitably eliminates this unacceptable uncertainty. I cannot condone the abandonment of such a rule when the result is to foreclose federal habeas review of federal claims based on conjecture as to the "meaning" of an unexplained order.

The Court's decision in *Ylst* demonstrates that we are destined to relive the period where we struggled to develop principles to guide the interpretation of ambiguous state-court orders. In *Ylst*, the last state court to render a judgment on Nunnemaker's federal claims was the California Supreme Court. Nunnemaker had filed a petition for habeas corpus in that court, invoking its original jurisdiction. Accordingly,

the court was not sitting to review the judgment of another state court, but to entertain, as an original matter, Nunnemaker's collateral challenge to his conviction. The court's order denying relief was rendered without explanation or citation. Rejecting the methodology employed just today by the *Coleman* majority, the *Ylst* Court does not look to the pleadings filed in the original action to determine the "meaning" of the unexplained order. Rather, the Court adopts a broad *per se* presumption that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst, post*, at 803. This presumption does not purport to distinguish between unexplained judgments that are entered on review of the reasoned opinion and those that are independent thereof.

The *Ylst* Court demonstrates the employment of the presumption by simply ignoring the judgment of the highest court of California, and by looking back to an intermediate court judgment rendered 12 years earlier to conclude that Nunnemaker's federal claims have been procedurally defaulted. In so concluding, the Court determines that an intervening order by the California Supreme Court, which, with citations to two state-court decisions, denied Nunnemaker's earlier petition invoking the court's original jurisdiction, is not "informative with respect to the question," *post*, at 805, whether a state court has considered the merits of Nunnemaker's claims since the procedural default was recognized. Thus, the Court dismisses two determinations of the California Supreme Court, rendered not in review of an earlier state-court judgment but as an exercise of its original jurisdiction, because it finds those determinations not "informative." While the Court may comfort itself by labeling this exercise "look[ing] through," see *post*, at 804, it cannot be disputed that the practice represents disrespect for the State's determination of how best to structure its mechanisms for seeking postconviction relief.

Moreover, the presumption adopted by the *Ylst* Court further complicates the efforts of state courts to understand and accommodate this Court's federal habeas jurisprudence. Under *Long*, a state court need only recognize that it must clearly express its intent to rely on a state procedural default in order to preclude federal habeas review in most cases. After today, however, a state court that does not intend to rely on a procedural default but wishes to deny a meritless petition in a summary order must now remember that its unexplained order will be ignored by the federal habeas court. Thus, the state court must review the procedural history of the petitioner's claim and determine which state-court judgment a federal habeas court is likely to recognize. It then must determine whether that judgment expresses the substance that the court wishes to convey in its summary order, and react accordingly. If the previous reasoned judgment rests on a procedural default, and the subsequent court wishes to forgive that default, it now must clearly and expressly indicate that its judgment *does not* rest on a state procedural default. I see no benefit in abandoning a clear rule to create chaos.

## III

Having abandoned the plain-statement rule with respect to a summary order, the majority must consider Coleman's argument that the untimely filing of his notice of appeal was the result of attorney error of sufficient magnitude as to constitute cause for his procedural default. In a sleight of logic that would be ironic if not for its tragic consequences, the majority concludes that a state prisoner pursuing state collateral relief must bear the risk of his attorney's grave errors — even if the result of those errors is that the prisoner will be executed without having presented his federal claims to a federal court — because this attribution of risk represents the appropriate "allocation of costs." *Ante*, at 754. Whether unprofessional attorney conduct in a state postconviction proceeding should bar federal habeas review of a state prisoner's

conviction and sentence of death is not a question of *costs* to be allocated most efficiently. It is, rather, another circumstance where this Court must determine whether federal rights should yield to state interests. In my view, the obligation of a federal habeas court to correct fundamental constitutional violations, particularly in capital cases, should not accede to the State's "discretion to develop and implement programs to aid prisoners seeking to secure postconviction review." *Pennsylvania* v. *Finley*, 481 U. S. 551, 559 (1987).

The majority first contends that this Court's decision in *Murray* v. *Carrier*, 477 U. S. 478 (1986), expressly resolves this issue. Of course, that cannot be so, as the procedural default at issue in *Murray* occurred on direct review, not collateral attack, and this Court has no authority to resolve issues not before it. Moreover, notwithstanding the majority's protestations to the contrary, the language of *Murray* strongly suggests that the Court's resolution of the issue would have been the same regardless of when the procedural default occurred. The Court in *Murray* explained: "A State's procedural rules serve vital purposes at trial, on appeal, and *on state collateral attack*." 477 U. S., at 490 (emphasis added). Rejecting Carrier's argument that, with respect to the standard for cause, procedural defaults on appeal should be treated differently from those that occur during the trial, the Court stated that "the standard for cause should not vary depending on the timing of a procedural default or on the strength of an uncertain and difficult assessment of the relative magnitude of the benefits attributable to the state procedural rules that attach at *each successive stage of the judicial process.*" *Id.*, at 491 (emphasis added).

The rule foreshadowed by this language, which the majority today evades, most faithfully adheres to a principled view of the role of federal habeas jurisdiction. As noted above, federal courts forgo the exercise of their habeas jurisprudence over claims that are procedurally barred out of respect for the state interests served by those rules. Recognition of

state procedural forfeitures discourages petitioners from attempting to avoid state proceedings and accommodates the State's interest in finality. No rule, however, can deter gross incompetence. To permit a procedural default caused by attorney error egregious enough to constitute ineffective assistance of counsel to preclude federal habeas review of a state prisoner's federal claims in no way serves the State's interest in preserving the integrity of its rules and proceedings. The interest in finality, standing alone, cannot provide a sufficient reason for a federal habeas court to compromise its protection of constitutional rights.

The majority's conclusion that Coleman's allegations of ineffective assistance of counsel, if true, would not excuse a procedural default that occurred in the state postconviction proceeding is particularly disturbing because, at the time of Coleman's appeal, state law precluded defendants from raising certain claims on direct appeal. As the majority acknowledges, under state law as it existed at the time of Coleman's trial and appeal, Coleman could raise his ineffective-assistance-of-counsel claim with respect to counsel's conduct during trial and appeal only in state habeas. *Ante*, at 755. This Court has made clear that the Fourteenth Amendment obligates a State " 'to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the State's appellate process,' " *Pennsylvania* v. *Finley*, 481 U. S., at 556, quoting *Ross* v. *Moffitt*, 417 U. S. 600, 616 (1974), and "require[s] that the state appellate system be 'free from unreasoned distinctions,' " *id.*, at 612. While the State may have wide latitude to structure its appellate process as it deems most effective, it cannot, consistent with the Fourteenth Amendment, structure it in such a way as to deny indigent defendants meaningful access. Accordingly, if a State desires to remove from the process of direct appellate review a claim or category of claims, the Fourteenth Amendment binds the State to ensure that the defendant has effective assistance of counsel for the entirety of the procedure

where the removed claims may be raised. Similarly, fundamental fairness dictates that the State, having removed certain claims from the process of direct review, bear the burden of ineffective assistance of counsel in the proceeding to which the claim has been removed.

Ultimately, the Court's determination that ineffective assistance of counsel cannot constitute cause of a procedural default in a state postconviction proceeding is patently unfair. In concluding that it was not inequitable to apply the cause and prejudice standard to procedural defaults that occur on appeal, the *Murray* Court took comfort in the "additional safeguard against miscarriages of justice in criminal cases": the right to effective assistance of counsel. 477 U. S., at 496. The Court reasoned: "The presence of such a safeguard may properly inform this Court's judgment in determining '[w]hat standards should govern the exercise of the habeas court's equitable discretion' with respect to procedurally defaulted claims." *Ibid.*, quoting *Reed* v. *Ross*, 468 U. S., at 9. "[F]undamental fairness is the central concern of the writ of habeas corpus." *Strickland* v. *Washington*, 466 U. S. 668, 697 (1984). It is the quintessence of inequity that the Court today abandons that safeguard while continuing to embrace the cause and prejudice standard.

I dissent.